UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURIE E. ALLEN,<br><br>    Plaintiff,<br><br>    v.<br><br>CALIFORNIA HIGHWAY PATROL, et al.,<br><br>    Defendants. | No. 2:13-cv-01821-MCE-EFB<br><br>FINAL EVIDENTIARY HEARING ORDER<br><br>HEARING DATE: FEBRUARY 6, 2018<br>TIME: 10:00 A.M. |

Having reviewed the parties' Joint Status Report ("JSR") filed January 9, 2018, the Court makes the following findings and orders with respect to the evidentiary hearing scheduled February 6, 2018, to determine Plaintiff's standing:

I. <u>UNDISPUTED FACTUAL ISSUES</u>

    1.    On June 4, 1995, Plaintiff Laurie Allen, under the name of Laurie Elaine Golsch, was married to Mike Deragon in the City of Reno, Washoe County, Nevada.

    2.    A marriage ceremony took place on September 16, 2011, between Laurie Deragon (Plaintiff) and Keith Wayne Allen in the City of Reno, Washoe County, Nevada.

    3.    On January 7, 2004, Plaintiff Laurie Allen filed a Petition for Dissolution of her marriage to Michael Deragon in Sacramento County Superior Court, Case No. 04-FL-00092.

1

4. In her petition for annulment of her marriage to Keith Wayne Allen, Plaintiff declared under penalty of perjury that she and Keith Wayne Allen had separated on November 17, 2005.

5. Plaintiff testified at deposition that she and Keith Wayne Allen had a point of separation in 2005, the length of which she cannot recall or remember.

6. Michael Deragon died in April 2011.

7. Approximately five months after Michael Deragon died, Keith Wayne Allen died on September 5, 2011.

8. During the course of Laurie Allen's "marriage" to Keith Allen, he was not consistently employed.

9. Laurie Allen did not rely in any way on Keith Allen for financial support.

10. While Laurie Allen was "married" to Keith, she provided financial support to him.

11. Three days after Keith Allen's death, on September 8, 2011, at approximately 1313 hours, ISU Investigator Tom Massetti and Investigator Galvez contacted Laurie Allen at her home in Fair Oaks, California, as part of the investigation.

12. A copy of the recorded interview of Laurie Allen was produced to Plaintiff's counsel on August 14, 2014, on a CD identified as "Audio Interviews conducted by Investigator Galvez (disc 1 of 2)," Bates Stamped No. CHP 000208.

13. Investigator Galvez began the interview on September 8, 2011, by asking Laurie Allen how long she and Keith had been married. In response, Laurie Allen told Investigator Galvez that she and Keith Allen got married right after 9-11, that is, on September 15, 2001.

14. When Investigator Galvez told Laurie Allen that from what they understood, they did not know that Keith Allen was married, in response, Laurie stated that she and Keith had been "separated for years."

15. During Investigator Galvez's discussion with Laurie Allen about the timeline and Keith's whereabouts in the days before his death, when Laurie Allen informed

Investigator Galvez that Keith had been out on Sunday, the day before he died, and that she did not know where he was. Laurie Allen then stated, "I was worried about Keith because his feet were cold and he had wanted me to baby him and take care of him like I used to, but I didn't want him to get really attached to me again, so I didn't."

16. Approximately 45 minutes into Investigator Galvez's interview with Laurie Allen, Laurie Allen spontaneously stated, "I have a boyfriend, I have a fiancé. Keith and I are still married but Craig and I have been together for six years."

17. On July 17, 2017, a letter was transmitted to Plaintiff's counsel with the Sacramento Superior Court records for Case Nos. 04-FL-00092, and 06-FL-01860, seeking a dismissal based on Plaintiff's lack of standing, or information that would show Plaintiff has standing.

18. On August 2, 2017, Plaintiff refused to dismiss this action, basing her standing on only two things: (1) the fact that Keith Allen's death certificate lists her as his surviving spouse—which they contend has not been challenged by any individual or entity (to their knowledge); and (2) on Plaintiff's maintenance of "a good faith belief in her role as decedent's spouse and successor-in-interest."

19. When the Coroner's Office releases a body, it requires a Release of Custody Certificate to be completed. In this case, the Release of Custody Certificate for Decedent's body was signed on September 9, 2011, by Laurie Allen, who stated her relationship was "wife." A representative from Evergreen Memorial verified that Laurie Allen signed the forms.

20. The Working Copy of the Certificate of Death for Keith Wayne Allen shows that Laurie Allen was the informant to the funeral home—that is, she was the person who provided all the personal information concerning the Decedent to the funeral home and they simply input that information into EDRS.

21. On April 2, 2012, the Coroner's Office received a call from Laurie Allen, asking them to change the Decedent's address on the Coroner's Report from "no permanent address," to her address, which request was directed to Deputy Vargas since

she had been the Deputy Coroner on the case.

II. <u>DISPUTED FACTUAL ISSUES</u>

The remaining claims for resolution at this hearing are:

**A. Plaintiff's Asserted Facts that are Disputed by Defendants:**

1. In early 2001, Plaintiff completed what she believed to be paperwork to dissolve her marriage from Michael Deragon with the assistance of an educator at the Placer County facility where she was staying at that time.

2. After Plaintiff completed paperwork to dissolve her marriage from Michael Deragon in 2001, she understood that the educator at Placer County who was assisting her with the Petition would handle the filing and service of the Petition.

3. After Plaintiff completed paperwork to dissolve her marriage from Michael Deragon in 2001 and gave the completed, signed forms to the educator at Placer County who was assisting her with the Petition, Plaintiff believed that she was divorced from Mr. Deragon.

4. On September 16, 2001, after she completed paperwork to dissolve her marriage from Michael Deragon, Plaintiff married Keith Wayne Allen at Chapel of the Bells in Reno, Nevada.

5. Plaintiff's marriage to Mr. Allen is listed in Book 1040, Page 97 of the Washoe County marriage record.

6. Plaintiff and Keith Allen both took their marriage vows very seriously, and Mr. Allen carried around the paper showing the recorded marriage in his wallet for many years, until the paper disintegrated.

7. Plaintiff and Mr. Allen held themselves out to the public as husband and wife.

8. In approximately late 2003 or early 2004, Plaintiff was surprised to learn from Mr. Deragon that her divorce from Mr. Deragon was not finalized.

9. After Plaintiff filed for divorce from Mr. Deragon in 2004, which is Case No. 04-FL-00092 in the Sacramento County Superior Court, she served the filing constituting

1 | the Petition for Dissolution on Mr. Deragon.

10. When Plaintiff received the executed proof of service back from the facility where she served Mr. Deragon with the Petition for Dissolution, she returned to the Sacramento County Superior Court, Family Law Courthouse and gave the proof of service to the clerk.

11. In approximately March 2006, Plaintiff learned that she and Mr. Deragon were still married and that the divorce she filed in 2004 (Case No. 04-FL-00092 in the Sacramento County Superior Court) was not finalized due to an error by a court clerk.

12. On March 9, 2006, Plaintiff filed a Petition for Nullity of Marriage as to her marriage to Mr. Allen (Sacramento County Superior Court Case No. 06-FL-01860) because she was informed by a family law clerk that she had to do so in order to effectuate the final dissolution of her marriage to Michael Deragon.

13. Plaintiff never served the Petition for Nullity of Marriage on Mr. Allen.

14. Plaintiff did not serve the Petition for Nullity of Marriage on Mr. Allen because she did not intend to end her marriage with Mr. Allen.

15. Plaintiff and Mr. Allen were never legally separated.

16. On March 9, 2006, a clerk at the Sacramento County Superior Court, Family Law Courthouse realized that the court had been in possession of the original, executed proof of service of the Petition for Dissolution on Mr. Deragon, and filed the proof of service.

17. It is clear from Investigator Galvez's interview with Laurie Allen that Plaintiff considered Mr. Allen to be her husband, that she loved him, and that she was grieving.

18. Plaintiff got the money together and made arrangements for a mortuary to pick up Mr. Allen's body from the coroner's office.

19. Together with Mr. Allen's sisters and aunts, Plaintiff arranged a graveside memorial service at the cemetery.

20. Plaintiff is referred to as Mr. Allen's wife in Mr. Allen's obituary.

21. Plaintiff signed hospital privacy forms as Mr. Allen's wife and is listed as

5

1 | Mr. Allen's wife on hospital forms.

22. Plaintiff is listed as Mr. Allen's surviving spouse on his death certificate.

23. Plaintiff continues to use Mr. Allen's last name to this day.

**B.  Defendants' Asserted Facts that are Disputed by Plaintiff:**

1. On March 9, 2006, Plaintiff filed a Petition for Nullity of Marriage as to her marriage to Keith Wayne Allen, Sacramento County Superior Court Case No. 06-FL-01860.

2. Plaintiff's marriage to Michael Deragon was never legally dissolved by any court.

3. The basis for Plaintiff's petition to annul the marriage between herself and Keith Wayne Allen was "bigamous marriage."

4. In the Petition for Nullity of Marriage as to her marriage to Keith Wayne Allen, Plaintiff requested that she be restored to her former name, Laurie Elaine Deragon.

5. When Laurie Allen and Keith Allen separated, Laurie dated Craig Conry, a friend who had lived with Laurie and Keith.

6. Laurie Allen had an intimate relationship with Mr. Conry while he was living with her before Keith passed away.

7. Laurie Allen's intimate relationship with Mr. Conry happened a couple times for a few months—it was kind of an off-and-on kind of thing-but had a relationship for about maybe two years in between, when Keith was gone because he had gotten arrested and went to prison.

8. Plaintiff's fiancé she identified as "Craig" on September 8, 2011, is the same Craig Conry with whom she had an intimate relationship in 2005, and his residence address has been the same as Plaintiff's address from at least 2007 to the present.

9. In the Coroner's investigation concerning the death of Decedent, first contact with any family was Kimberly Allen—the Decedent's sister—on September 5,

1 | 2011, where Kimberly Allen advised that Decedent was homeless and had been
2 | sleeping in a van outside of her residence, and that she did not know if Decedent was
3 | still married or not, but she thought he might be married to a woman named Laurie Allen.

10. On September 6, 2011, the Coroner's Office spoke with Mary Mendoza – Decedent's aunt who advised that she did not know if Decedent was legally married or divorced, that she had never met Laurie, and that Decedent had one adult daughter with another woman. Ms. Mendoza had no contact information for Laurie or Decedent's daughter.

11. Later on September 6, 2011, the Coroner's Office received a call from Charlene Allen, identifying herself as Decedent's daughter, indicating that she did not know how to locate Laurie, but asked that if the Coroner's Office found Laurie, they give Charlene's contact information to her.

12. In terms of information for a death certificate, the Coroner's office does not issue the death certificate, it only provides information that goes on the certificate. Specifically, the Coroner's Office enters information on cause and manner of death through the Electronic Death Registration System (EDRS).

13. The Coroner's office does not require that someone claiming to be the spouse of a decedent provide a copy of a marriage license or certificate unless there is some dispute about status.

14. Information for a death certificate concerning next-of-kin, marital status, parents of a decedent, address, and other personal information of the decedent, is typically provided by the family to the funeral home. The funeral home then enters that information into the EDRS.

15. Deputy Vargas did not change the address on the Coroner's Report as Laurie Allen requested because, when the case was initially reported to her, she was told by Decedent's sister, Kimberly Allen, that Decedent was homeless and was sleeping in a van outside of her residence.

16. Apart from Plaintiff not having had the type of personal relationship with

Decedent to implicate Fourteenth Amendment due process protections, Plaintiff has not challenged a state statute or law (state action) that would even trigger the analysis in which such personal relationships are considered.

All issues of fact remaining in dispute are subject to proof at the time of the evidentiary hearing.

III. WITNESSES

Plaintiff anticipates calling the witnesses listed on Attachment "A".

Defendants anticipate calling the witnesses listed on Attachment "B".

Each party may call a witness designated by the other.

IV. EXHIBITS - SCHEDULES AND SUMMARIES

At present, Plaintiff contemplates by way of exhibits those listed on Attachment "C".

At present, Defendants contemplate by way of exhibits those listed on Attachment "D".

The parties are ordered to file their respective exhibit lists on **January 30, 2018**, in whatever format (i.e., hard copy or electronic) they agree upon. The parties must expressly reserve the right to offer additional exhibits at the hearing. The exhibit list should be in Microsoft Word and can be emailed to mceorders@caed.uscourts.gov. Exhibits shall be emailed to the same address.

No email shall exceed 45 MB in size, and each email shall include in the subject line the case name, case number, and, if more than one email is submitted, a description indicating the number of emails being sent and the place the email occupies in the series (e.g., "1 of 10," "2 of 10," etc.). If the exhibits are so numerous that submission will require in excess of 15 emails, the parties shall provide the electronic exhibits to the Courtroom Deputy on a jump drive (also known as, among other things, a flash drive, USB drive, etc.). Unless otherwise ordered by the Court, the parties shall retain custody of any physical exhibits incapable of being submitted electronically and shall remain responsible for the custody of those exhibits throughout the duration of the evidentiary

hearing.

The Court shall be presented with a copy of the exhibit(s) in a 3-ring binder(s) with a side tab identifying each exhibit by number or letter. Each binder shall be no larger than three inches in width and have an identification label on the front and side panel.

The Plaintiffs' exhibits shall be listed numerically. Defendant's exhibits shall be listed alphabetically.

The parties shall use the standard exhibit stickers provided by the Court Clerk's Office and exhibits should be marked with the case number, exhibit number and page number of the exhibit if applicable. The exhibit sticker must not obstruct any portion of the exhibit and if needed the sticker should be placed on the back of the page.

All exhibits must be single sided. All photographs must be marked individually. Each page of a multipage exhibit must be marked individually (i.e., 16cv01234, Ex. 1, 1-19 or Ex. A, 1-19). For defense exhibits, after exhausting the alphabet, use A(2) through A(100), then B(2) through B(100), and so on to avoid confusion for the Court and counsel.

Each party may use an exhibit designated by the other.

The list of exhibits shall not include excerpts of depositions which may be used to impeach witnesses. Each party may use an exhibit designated by the other. In the event that Plaintiffs and Defendant offer the same exhibit, that exhibit shall be referred to by the designation the exhibit is first identified. The Court cautions the parties to pay attention to this detail to avoid confusion that may result if one exhibit is identified with both a number and a letter.

C.  As to each exhibit, each party is ordered to exchange a copy identical to the Court's copy, or other reproduction of the exhibit(s) in whatever format (i.e., hard copy or electronic) they agree upon by **January 30, 2018**.

D.  **The Court shall be presented with a copy of the exhibit(s) in a 3-ring binder(s) with a side tab identifying each exhibit by number or letter. Each binder shall be no larger than three inches in width and have an identification label on the**

9

**front and side panel.**

The parties are ordered to provide an electronic version of each individual exhibit and their exhibit list to the Courtroom Deputy by **January 30, 2018**.

V. DISCOVERY DOCUMENTS

A. <u>Filing Depositions</u>. It is the duty of counsel to ensure that any deposition which is to be used at the evidentiary hearing has been lodged with the Clerk of the Court. In addition, two unmarked copies of the transcripts must be delivered to the Court Clerk's Office. Counsel are cautioned that a failure to discharge this duty may result in the Court precluding use of the deposition or imposition of such other sanctions as the Court deems appropriate.

B. <u>Use of Depositions</u>. The parties are ordered to file with the Court and exchange between themselves by **January 30, 2018** a statement designating portions of depositions intended to be offered or read into evidence (except for portions to be used only for impeachment or rebuttal).

C. <u>Interrogatories</u>. The parties are ordered to file with the Court and exchange between themselves by **January 30, 2018** the portions of Answers to Interrogatories which the respective parties intend to offer or read into evidence at the hearing (except portions to be used only for impeachment or rebuttal).

VI. AUDIO/VISUAL EQUIPMENT

The parties are required to file electronically a joint request to the Courtroom Deputy Clerk, Stephanie Deutsch, by January 30, 2018 if they wish to reserve and arrange for orientation with all parties on the Court's mobile audio/visual equipment for presentation of evidence. There will be one date and time for such orientation.

VII. DATE AND LENGTH OF EVIDENTIARY HEARING

An evidentiary hearing is scheduled for **February 6, 2018 at 10:00 a.m.**. The estimated length of the hearing is **1 day.** Counsel are to call Stephanie Deutsch, Courtroom Deputy, at (916) 930-4207, by **January 30, 2018** to ascertain the status of the hearing date. The Court will permit each side up to ten (10) minutes for closing

arguments. Plaintiff will be permitted to reserve time for rebuttal purposes but will be required to monitor any time so reserved.

VIII. OBJECTIONS TO THIS ORDER

Each party is granted two (2) court days from the date of this Order to object to any part of the order or to request augmentation to it. This Order will be modified only upon a showing of manifest injustice. If no objection or modifications are made, this Order will become final without further order of the Court and shall control the subsequent course of the evidentiary hearing.

IT IS SO ORDERED.

Dated: January 16, 2018

_____
MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE